UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION


UNITED STATES OF AMERICA               CRIMINAL NO. 14-cr-00167(01)

VERSUS                                 JUDGE FOOTE

JOSE R. SEGOVIA-AYALA                   MAGISTRATE JUDGE HORNSBY


## REPORT AND RECOMMENDATION

**Introduction**

Defendant is charged with one count of possession of heroin with intent to distribute and two counts of transporting illegal aliens.  The charges arise out of a traffic stop that occurred on I-20 in Bossier Parish.  Before the court is Defendant's Motion to Suppress (Doc. 39), in which he challenges the validity of his consent to search, the voluntariness of his statements, and a search of his cell phone.

**Background Facts**

Trooper Brent Peart of the Louisiana State Police initiated a traffic stop on I-20 in Bossier Parish at approximately 5:20 a.m. after he saw a van cross the fog line several times. He also noticed that the van accelerated and slowed down for no apparent reason.  Audio and video of the traffic stop was recorded on Trooper Peart's dash camera.  The recording was introduced in the hearing as Government Exhibit A.

Trooper Peart made contact with Defendant, the driver, at the driver's side window and asked him to exit the van.  Trooper Peart explained to Defendant why he was stopped,

and that he thought Defendant might be intoxicated or sleepy.  Defendant admitted that he was tired and intended to stop soon to get some coffee.

Defendant produced a Maryland driver's license and told Trooper Peart that the vehicle was registered to him.  Defendant told Trooper Peart that he was traveling from Houston to Maryland.  There were two passengers in the van.  Although Defendant said he knew the occupants for six months, he was unable to provide either passenger's first or last name. Trooper Peart noticed that the van was an older model van that had recently been registered. (He could determine this by the first letter or so of the license plate.)  Peart stated that drug and alien smugglers do not want to risk losing a more expensive vehicle in the event of an arrest or seizure.

From the beginning of the stop, Defendant appeared extremely nervous.  Trooper Peart observed that Defendant's carotid artery was pulsating, Defendant's hands were very sweaty, and Defendant would not make eye contact.  Trooper Peart also noticed that Defendant paused frequently and looked away while speaking.  (The court notes that Defendant's primary language is Spanish, but he has been in the United States for over eight years and speaks fairly good conversational English.)

When Trooper Peart first approached the van to speak to the driver, the front seat passenger was awake and sitting upright in the passenger's seat.  When Trooper Peart approached the passenger a few minutes later to ask about identification and travel itinerary, the passenger pretended to be asleep.  The front seat passenger produced a Mexican identification card and advised that the group was traveling to Washington, D.C. to visit

family.  The backseat passenger had no identification documents.  He spoke no English. Trooper Peart noticed a strong chemical smell, possibly ammonia, coming from the vehicle. He also saw that there was only one piece of luggage in the van.

Trooper Peart returned to his patrol car to perform a check on Defendant, his license, and the van.  Defendant had a valid Maryland driver's license and the van, which was a 2003 model, was recently registered to Defendant in Texas.  Trooper Peart also checked MapQuest to verify that the most direct route from Houston to Maryland would have placed Defendant on I-10, not I-20.  Trooper Peart ran Defendant's license plate through the BOSS system, a license plate reader system located near the state lines of Texas and Louisiana.  The system reflected that Defendant's vehicle had traveled the I-10 corridor several times, and the I-20 corridor at least once, in the last month.  Tropper Peart suspected that Defendant was engaged in some type of smuggling.  Trooper Peart prepared a consent to search form and called for backup.

Trooper Peart exited his patrol car and returned to Defendant.  He told Defendant that he was only going to issue a verbal warning.  Trooper Peart returned Defendant's driver's license and registration to him.   Immediately thereafter, Trooper Peart explained that law enforcement sees "a lot of bad things coming down I-20 as a corridor." Tr., p. 20.  Peart then asked Defendant if he could search the vehicle.  Defendant quickly agreed.  Trooper Peart presented Defendant with a Louisiana State Police consent to search form.  The consent form, which was introduced into evidence as Government Exhibit B, is divided into two parts – an English part at the top and a Spanish part at the bottom.  Defendant signed the Spanish

version of the consent form. A K-9 officer had arrived on the scene at this point, but Peart did not use the dog because he had obtained consent.

After a brief search, Trooper Peart found approximately five pounds of heroin located in hidden compartments inside the rear quarter panels of the van.  The heroin bundles were packaged individually with minced garlic wrapped around them to conceal the odor.  The troopers handcuffed all three of the occupants and recited to them their Miranda rights. Defendant was advised of his Miranda rights as he was being handcuffed face down on the side of the road.  The warnings were spoken, but not shouted, in a clear voice that is easily understood over the traffic and other noise.  At the conclusion of the rights, the officer asked Defendant if he understood his rights.  However, because of the road noise and other conversations, the court cannot tell whether or how Defendant responded to that question. Trooper Peart did not testify as to whether he heard any response from Defendant.

Trooper Peart approached Defendant, who was sitting on the ground in front of Trooper Peart's patrol car.  Peart asked Defendant whether there were any vehicles that were following him out of Texas.  Trooper Peart testified that it is common for drug or alien smugglers to be followed by another vehicle.  For a time, Defendant remained silent. Trooper Peart persisted in his questions, and Defendant eventually said that he knew he was being followed.  Trooper Peart also asked him if there were any additional drugs in the van. Defendant stated that he did not know.

Defendant was taken to a police station where he was again advised of his Miranda rights.  He then signed a Spanish-language waiver of rights form.  Defendant reportedly

made additional incriminating statements at the station.  Trooper Peart did not participate in that interview.

**Law and Analysis**

### The Traffic Stop

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968)." United States v. Rosales-Giron, 2014 WL 6065297, at *4-5 (5th Cir. Nov. 14, 2014); United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id.

For a traffic stop to be justified at its inception, an officer need only have reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005). "Reasonable suspicion" analysis requires assessing the totality of the circumstances to ascertain the reasonableness of the suspicion. United States v. Powell, 732 F.3d 361, 369 (5th Cir. 2013). This is consistent with the "touchstone of Fourth Amendment analysis [being] reasonableness," which "requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement." United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004) (en banc).

The Supreme Court held unanimously in Whren v. United States, 517 U.S. 806 (1996): "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. at 810. "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." United States v. Zavala, 541 F.3d 562, 575 (5th Cir.2008). Therefore, probable cause to make a traffic stop exists, *inter alia*, when a defendant commits a traffic violation and a law-enforcement officer observes the violation.  United States v. Khanalizadeh, 493 F.3d 479, 482 (5th Cir.2007).

"The rule established by the Supreme Court in Whren allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop," United States v. Cole, 444 F.3d 688, 689 (5th Cir. 2006).  On the other hand, the legal justification for the traffic stop must be "objectively grounded."  Id.

Terry's first prong is easily met in this case.  Trooper Peart's testimony was credible that he saw Defendant's van cross the fog line several times, and Defendant increased and decreased his speed several times.  Once the stop was made, Defendant admitted he was tired and planned to stop soon for coffee.  Thus, Trooper Peart had probable cause to believe that Defendant had committed traffic violations and was either intoxicated or sleepy.

Terry's second prong asks whether the officer's actions were reasonably related in scope to the circumstances that justified the stop.  An officer's subsequent actions are not reasonably related in scope to the circumstances that caused the officer to stop the vehicle

if the officer detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless the officer develops reasonable suspicion of additional criminal activity in the meantime. Brigham at 506. If the officer develops reasonable suspicion of additional criminal activity during the investigation of the circumstances that originally caused the stop, the officer may further detain the occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. Id.; United States v. Aguilera, No. 2014 WL 7404535, at *3 (N.D. Tex. Dec. 30, 2014).

An officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop. United States v. Pack, 612 F.3d 341, 349-350 (5th Cir. 2010). The officer may also ask about the purpose and itinerary of the occupants' trip as part of this investigation, because these questions are considered to be reasonably related in scope to the investigation of the circumstances that caused the stop. Id. Additionally, an officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop. Id. The reasoning behind this rule is that the Fourth Amendment protects against detention, not questioning. Id. Thus, no Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed. Id.

Trooper Peart acted promptly and professionally in investigating the reasonable suspicion that arose during the stop. Defendant was nervous and his carotid artery was

pulsating.  Defendant did not know the names of the occupants of the vehicle, although he said he had known them for six months.  (He knew one by a nickname only.)  One occupant provided a travel itinerary that was someone different than that provided by Defendant.

Peart's suspicion of drug or alien smuggling was further increased because: (1) Peart noticed a strong chemical smell each time he approached Defendant's vehicle; (2) Defendant did not appear to be taking the most direct route from Houston to his stated destination of Maryland; (3) The BOSS System – which attempts to record the license plates of vehicles on the interstate – showed that Defendant made frequent trips along the interstate; (4) There was only one piece of luggage in the vehicle, despite the fact that all three occupants of the vehicle were allegedly traveling from Houston to Maryland for a visit;  (5) Neither passenger had any state-issued identification, and only one had a Mexican identification card; and (6) the vehicle was an older model van that had recently been registered – drug and alien smugglers do not want to risk seizure or forfeiture of a new, more expensive vehicle.

The totality of these factors support Trooper Peart's reasonable suspicion of additional criminal activity.  With reasonable suspicion present, the continued detention of Defendant during the stop was constitutional.

**Consent to Search**

To determine whether Defendant's consent to search was voluntary, this court must consider (1) the voluntariness of Defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of Defendant's cooperation with the police; (4) Defendant's awareness of his right to refuse consent; (5) Defendant's education and

intelligence; and (6) Defendant's belief that no incriminating evidence would be found. United States v. Jones, 234 F.3d 234, 242 (5th Cir.2000). The court must consider all of these factors, and no one factor is determinative. Id. The government bears the burden of proving consent was voluntary. Id.

Factor 1: Defendant was not in custody at the time he gave oral and written consent. He was not handcuffed or restrained. While Defendant was never told he was free to leave, his driver's license had been returned to him. The minimal detention that led up to the request for consent was no more than what any motorist experiences while being issued a traffic citation. Aguilera, supra.

Factor 2: Trooper Peart was respectful to Defendant and did not use any deceptive or coercive tactics to obtain consent to search. In fact, Defendant was very cooperative and – until the drugs were discovered – did not demonstrate reluctance, hostility, or fear.

Factor 3: Defendant was aware of his right to refuse consent. After giving verbal consent, Defendant was presented with a written consent form in both Spanish and English. That form advised Defendant of his right not to consent and his right to revoke his consent at any time. Defendant signed the Spanish version of the form.

Factor 4: Defendant appeared intelligent and coherent throughout the video. Nothing suggests that Defendant was mentally impaired or handicapped.

Factor 5: Defendant likely believed that the drugs would not be found. The drugs were well hidden inside the panels of the vehicle.

After considering all of the factors, and following a careful review of the video and audio of the stop, the undersigned finds that Defendant's verbal and written consent to search were given freely and voluntarily.

### Defendant's Post-Arrest Statements

Defendant also argues that his post-arrest statements to the officers were not made freely and voluntarily.  A statement or confession is voluntary if it is the product of the defendant's free and rational choice; it is voluntary in the absence of official overreaching either by direct coercion or subtle psychological persuasion. U.S. v. Bell, 367 F.3d 452, 460-461 (5th Cir. 2004);  U.S. v. Mullen, 178 F.3d 334, 341 (5th Cir. 1999).  The statement must be voluntarily, knowingly, and intelligently made, and the individual confessing must be cognizant of the rights being abandoned and the consequences of doing so.  U.S. v. Santiago, 410 F.3d 193, 202 (5th Cir. 2005).  When a defendant challenges the voluntariness of his confession, the government must prove its voluntariness by a preponderance of the evidence in order for the confession to be admissible as substantive evidence at trial.  U.S. v. Clay, 408 F.3d 214, 221 (5th Cir. 2005).

Voluntariness is evaluated based on the totality of the circumstances, including the characteristics of the accused and the details of the interrogation.   Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973); U.S. v. Barlow, 41 F.3d 935 (5th Cir. 1994).  Factors include the age of the accused, his intelligence and education, advice regarding his constitutional rights, length of detention, repeated and prolonged nature of the questioning and whether physical punishment such as deprivation of food or sleep was imposed.  Id.  No

case turns on the presence or absence of a single factor.  Id.  Where the prosecution shows that a valid Miranda warning was given and understood by the accused, the accused's uncoerced statement establishes an implied waiver of the right to remain silent.   Berghuis v. Thompkins, 500 U.S. 370, 386 (2010).

Defendant's arguments regarding the voluntariness of his statements are not persuasive.  Defendant was read his Miranda rights immediately upon his arrest.  (Contrary to Defendant's argument, the trooper did not yell the rights at Defendant.)  He was asked whether he understood those rights, but traffic and other background noise at that moment muted any response he may have given.  However, there is no basis in the record to conclude that Defendant did not understand his rights.  Initially, Defendant said nothing when asked by Trooper Peart whether another vehicle was following him.  His initial silence is at least some indication that he understood that he did not have to answer questions.  But, his initial silence was certainly not a proper invocation of his right to remain silent.  Again, an accused who wants to invoke his right to remain silent must do so unambiguously.  Berghuis, 500 U.S. at 381.  Defendant never stated that he wanted to remain silent or that he did not want to talk with the police.

Defendant spoke fairly good, but not great, English.  Until the moment of arrest, he and Trooper Peart talked without difficulty about his itinerary, his reason for the trip, and other matters.   On the few occasions when Defendant did not understand a question, Peart rephrased the question, and the conversation continued.

Other factors also support a valid <u>Miranda</u> waiver.  Defendant was not coerced or forced to answer questions.  There was no physical punishment.  The interrogation lasted only a few moments on the side of the road while the officers finished their search of the van.  Trooper Peart did play on Defendant's heartstrings by telling Defendant that he only wanted to get him back to his family.  While such a statement was not particularly straightforward, courts have found <u>Miranda</u> waivers voluntary even in cases where officers employed deceitful tactics. <u>Soffar v. Cockrell</u>, 300 F.3d 588, 596 (5th Cir. 2002).

**Defendant's Cell Phone**

There is no evidence that Trooper Peart searched Defendant's cell phone on the side of the road or later.  The phone was searched only after a federal search warrant was obtained for that purpose.

**Conclusion**

Defendant's arguments lack merit.  Defendant's continued detention was justified by Trooper Peart's reasonable suspicion that Defendant was engaged in some kind of smuggling operation.  Defendant validly waived his <u>Miranda</u> rights and voluntarily made incriminating statements.  Before further questioning at the jail, Defendant again waived his <u>Miranda</u> rights (using a Spanish language form) and made additional incriminating statements.  The cell phone was not searched until this court issued a search warrant for the phone.

Accordingly;

IT IS RECOMMENDED that **Defendant's Motion to Suppress (Doc. 39) be denied**.

**Objections** – <u>**Note: Deadlines Have Been Shortened**</u>

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **seven (7) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b).  A party may respond to another party's objections within **three (3) days** from the filing of the objections.  Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 23rd day of January, 2015.

Mark L. Hornsby
U.S. Magistrate Judge